## BURTNETT et al. v. UNITED STATES.
### No. 638.

Circuit Court of Appeals, Tenth Circuit.
Dec. 20, 1932.

W. D. Jochems, of Wichita, Kan. (O. A. Keach, of Wichita, Kan., on the brief), for appellants.

Donald Little, Asst. U. S. Atty., of Topeka, Kan. (S. M. Brewster, U. S. Atty., of Topeka, Kan., on the brief), for the United States.

Before LEWIS, COTTERAL, and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge.

Burtnett and Keatch were charged by indictment containing four counts with violations of section 3, title 2, of the National Prohibition Act (27 USCA § 12).

The first count charged possession on February 15, 1930, the second charged a sale on that date, and the third charged a sale on March 15, 1930, at Wichita, Kansas, of substandard fluid extract of ginger containing more than one-half of one percent of alcohol by volume, intended and fit for beverage purposes. The proof showed that the sale charged in count three occurred on February 15, 1930, instead of the date charged. The fourth count charged that the defendants on March 15, 1930, maintained a common nuisance at 328 North Main street, Wichita, Kansas, by there keeping for sale and selling intoxicating liquor intended and fit for beverage purposes, to-wit: substandard fluid extract of ginger containing more than one-half of one percent of alcohol by volume.

The facts, as shown by the government's evidence, are these: Eastland, a prohibition agent, went to defendants' drug store located at 328 North Main street, Wichita, Kansas, on February 15, 1930, and asked Burtnett for two bottles of "jake." Burtnett handed two two-ounce bottles to Eastland and the latter paid Burtnett one dollar therefor. Later, on the same day, Eastland returned to the drug store and again asked Burtnett for two bottles of "jake." Burtnett handed Eastland one two-ounce bottle and the latter paid him therefor. Eastland delivered these bottles and their contents to Fulton, a government chemist.

Fulton made a chemical analysis of the contents of the two bottles. Each contained fluid extract of ginger, which did not conform to the standard of the United States Pharmacopœia. They contained the required amount of alcohol, but only about one-fifth of the required amount of ginger root. The deficiency in ginger was supplied by adulterants. The liquid was lighter in color than fluid extract of ginger, and the alcohol odor and flavor predominated therein. Dilution would render it potable and it would then be fit for use as a beverage.

Standard fluid extract of ginger is very dark in color, and the alcohol cannot be detected by taste or smell.

Eastland purchased such fluid extract of ginger to secure evidence, and not to use as a beverage.

Herron asked Keatch for a bottle at the drug store in February, 1930. Keatch handed him a two-ounce bottle of Jamaica ginger, and he paid Keatch fifty cents therefor. Herron went to the back end of the drug store, mixed the Jamaica ginger with water and drank it. Herron also purchased a bottle of Jamaica ginger from Burtnett in February, 1930, mixed it with water and drank it. Herron made similar purchases from Burtnett throughout the month of February. On March 23, 1930, he purchased two bottles, one from Keatch and one from Burtnett. He drank one of them in the back end of the store. On one occasion he complained to Keatch about the quality of the Jamaica ginger and the next evening Keatch said to him, "I got some new stuff, send that back."

Brewer purchased a bottle of "jake" from Burtnett at the drug store in March, 1930. He purchased "jake" from both Keatch and Burtnett in October, 1929. He diluted it with water and drank it, and it had the same effect on him as whiskey.

In February, 1930, Beatrice Allison requested Keatch not to sell any more Jamaica ginger to her husband. Keatch replied that if he didn't sell it to him somebody else would.

Frank Allison purchased a bottle of Jamaica ginger from Keatch on February 28, 1930, and paid him fifty cents therefor.

The evidence for the defendants consisted of testimony that they were men of good character, and that Keatch was not present at the time and place of the alleged sale to Frank Allison.

At the close of all the evidence, defendants moved for a directed verdict of not guilty on each count. These motions were overruled. Defendants were found guilty and sentenced on each of the four counts, and have appealed.

454

·The provisions of the National Prohibition Act, material to the questions here presented, are set out in note 1.

It is urged that the fluid extract of ginger possessed and sold by defendants was a medicinal preparation; that it fell within the descriptions and limitations set forth in section 13, title 27 USCA; that the evidence established that it was not sold for beverage purposes, and therefore the court erred in overruling the motions for directed verdicts on counts 1, 2 and 3.

The definitions in sections 4 and 13, title 27 USCA are mutually exclusive. To come within the provisions of subparagraphs (b) and (c) of section 13, the "article" must be unfit for use for beverage purposes, and to come within the provisions of section 4 the "liquid" or "compound" must be fit for use for beverage purposes. Campbell v. Galeno Chemical Co., 281 U. S. 599, 50. S. Ct. 412, 74 L. Ed. 1063.

NOTE 1. Section 1, title 2, of the National Prohibition Act, being section 4, title 27 USCA, in part reads as follows:

"When used in this title (1) The word 'liquor' or the phrase 'intoxicating liquor' shall be construed to include alcohol, brandy, whisky, rum, gin, beer, ale, porter, and wine, and in addition thereto any spirituous, vinous, malt, or fermented liquor, liquids, and compounds, whether medicated, proprietary, patented, or not, and by whatever name called, containing one-half of 1 per centum or more of alcohol by volume which are fit for use for beverage purposes."

Section 3, title 2, of the National Prohibition Act, being section 12, title 27 USCA, in part reads as follows:

"No person shall manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor except as authorized in this chapter, and all the provisions of this chapter shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented."

Section 4, title 2, of the National Prohibition Act, being section 13, title 27 USCA, reads as follows:

"The articles enumerated in this section shall not, after having been manufactured and prepared for the market, be subject to the provisions of this chapter if they correspond with the following descriptions and limitations, namely: * * *

"(b) Medicinal preparations manufactured in accordance with formulas prescribed by the United States Pharmacopœia, National Formulary or the American Institute of Homeopathy that are unfit for use for beverage purposes.

"(c) Patented, patent, and proprietary medicines that are unfit for use for beverage purposes. * * *

"A person who manufactures any of the articles mentioned in this section may purchase and possess liquor for that purpose, but he shall secure permits to manufacture such articles and to purchase such liquor, give the bonds, keep the records, and make the reports specified in this chapter and as directed by the commissioner. No such manufacturer shall sell, use, or dispose of any liquor otherwise than as an ingredient of the articles authorized to be manufactured therefrom. No more alcohol shall be used in the manufacture of any extract, sirup, or the articles named in paragraphs b, c, and d of this section which may be used for beverage purposes than the quantity necessary for extraction or solution of the elements contained therein and for the preservation of the article."

■ The evidence of· the government established that the ginger extract involved in counts 1, 2 and 3 contained more than one-half of one percent of alcohol by volume, and that it was fit for beverage purposes. If such evidence was true, then, while it may have been a medicated or proprietary liquid or compound, it fell within the definition of intoxicating liquor, as defined in section 4. The fact that it was fit for beverage purposes took it without the provisions of section 13, and the fact that the purchaser did not buy it for beverage purposes was immaterial.

We do not mean by the foregoing that a person would be guilty of a violation of section 12, title 27 USCA, who possessed or sold such a compound in good faith for medicinal purposes without knowledge that it was substandard and fit for beverage purposes. A druggist might purchase fluid extract of ginger from a reputable manufacturer having a government permit, and might sell it in good faith for medicinal purposes without knowledge that it was substandard and fit for beverage purposes. In such a case criminal intent would be lacking and he would not be guilty. United States v. Nomel Products Co. (C. C. A. 2) 47 F.(2d) 575, 577.

On the other hand, if the circumstances were such as to charge a person with knowledge that the fluid extract of ginger either was substandard or was fit for beverage purposes, and to show that he possessed and sold it, and that it contained more than one-half of one percent of alcohol by volume and was fit for beverage purposes, such possession and sale would violate section 12.

. The fluid extract of ginger sold in the instant case had approximately one-fifth of the ginger content required by the standard of the United States Pharmacopœia. It was much lighter in color than standard fluid extract of ginger; the alcohol content could be detected both by taste and smell. That it was not standard fluid extract of ginger therefore could have been readily detected.

■■ For the purpose of determining the intent of the defendants with respect to the · sales charged in counts 2 and 3, the circumstances surrounding other sales made both prior and subsequently thereto could be considered. The proof showed that the defendants made frequent sales to the same persons; that in some instances the fluid extract of ginger was drunk on the premises; that on one occasion a complaint was made as to its quality and that one of the defendants said they had a new supply which was better; and the purchaser usually called for

"jake" or a "bottle." These circumstances, in our opinion, were sufficient to warrant the jury in finding that the defendants were selling fluid extract of ginger, not in good faith as a medicine, but as intoxicating liquor to be used for beverage purposes.

■ It is contended that the fluid extract of ginger was not fit for use for beverage purposes because it had to be diluted before it could be drunk. We are of the opinion that a compound or liquid is fit for beverage purposes, within the meaning of section 4, if it can be made potable by a simple process, such as dilution with water, ginger ale, or the like. Hawthorne v. United States (C. C. A. 4) 37 F.(2d) 316.

We conclude the motions for directed verdicts on counts 1, 2 and 3 were properly denied.

■ Eastland testifying at the trial stated that the three bottles purchased on Feb. 15, 1930, were unlabeled. Defendants' counsel inquired if he did not testify to the contrary at the preliminary examination before the United States commissioner. Eastland stated that his testimony there referred to identifying labels he placed on the bottles after purchasing them. Counsel for the defendants then undertook to introduce his testimony given before the commissioner to show the contrary. The court confined counsel to the questions and answers with respect to labels and refused to permit them to introduce sufficient of the context to show that the witness was referring to the labels on the bottles when purchased, and not to identifying labels thereafter placed on them. We think the court erred in so restricting this impeaching evidence.

■ Frank Allison testified that he purchased a bottle of Jamaica ginger from Keatch at the drug store between ten and eleven o'clock on the night of February 28, 1930. Joella Watson testified that on that date, between six-thirty and seven o'clock in the evening, she and her husband, and Mr. and Mrs. Keatch went to the Air Capital Café for dinner, and from there went to the Watson home, where they remained until midnight; that during that time Keatch was with them constantly and did not go to the drug store; that they were celebrating Mrs. Keatch's birthday and for that reason she was able to fix the date as February 28, 1930.

In its general charge the court, after properly charging as to the defense of alibi, said:

"But if you believe from all of the evidence and circumstances beyond a reasonable doubt that the plea of an alibi was not interposed in good faith, or that the evidence to sustain it was not true, then this is a discrediting circumstance to which you may look in connection with all of the other evidence in determining the guilt or the innocence of the defendant so far as that act was concerned. Of course, we all know that men are sometimes mistaken as to the hour when things occur. Those are matters which the jury may take into consideration from your common knowledge of things that happen among men."

The quoted comment was unfair and unjust. Mrs. Watson was a disinterested witness. Her testimony had every earmark of truth; it was in no wise impeached nor discredited; it presented a square issue of credibility as between Allison and Mrs. Watson.

Evidence of an alibi "is mere ordinary evidence in rebuttal. Any charge to the jury that it is not—as, that the law looks with disfavor upon it, or that it should be tested differently from other evidence—is erroneous." Bishop's New Criminal Procedure, vol. 11, § 1062; State v. Crowell, 149 Mo. 391, 50 S. W. 893, 73 Am. St. Rep. 402; State v. Chee Gong, 16 Or. 534, 19 P. 607; People v. Lattimore, 86 Cal. 403, 24 P. 1091; Henry v. State, 51 Neb. 149, 70 N. W. 924, 66 Am. St. Rep. 450; Walker v. State, 37 Tex. 366; Crisson v. State, 51 Ga. 597. Evidence of an alibi has no inherent characteristics which make its verity doubtful.

While it might have been proper for the court in his comments on the evidence to review any evidence which discredited the evidence of alibi, in the absence of such discrediting evidence we doubt the propriety of the portion of the charge quoted above.

In its general charge the court further said:

"If you find that the fluid extract of ginger, as alleged in the indictment, to have been sold, was sold and that it did not conform to the formula set out in the United States Pharmacopœia, and that it contained more than one-half of one percent of alcohol by volume, then it should be classified as an intoxicating liquor, as heretofore defined by Congress; and if you find that the ginger extract alleged to have been sold was of substandard quality, and that the defendants made the sale as alleged in the indictment, then this would constitute a violation of the National Prohibition Act.

"But on the other hand, if you find that the extract of ginger as alleged to have been sold by the defendants conformed to the United States Pharmacopœia, and even though a sale or sales had been made, this would not constitute a violation of the National Prohibition Act under this indictment, and it would be your duty to find the defendants not guilty. * * *

"Now, in order to find the defendants guilty of maintaining a nuisance, if the evidence—it is sufficient if you are satisfied by the evidence beyond a reasonable doubt that intoxicating liquors were kept for sale in violation of law, as alleged in the indictment."

An exception was taken to the first and second paragraphs of the charge above quoted. Whereupon the court said:

"You might add in that instruction, where I told you if you found that it contained more than one-half of one percent by volume, and was sold for beverage purposes. The jury will understand that."

A further exception was taken, as follows:

"* * * it is our contention that the instruction should be in substance to the effect that if the article was not whiskey or was not alcohol, in and of itself, but that it *was a proprietary remedy or an ingredient or compound*, by whatever name called, containing more than one-half of one percent of alcohol, that then it would still not be a violation of the law, unless the jury should find it was fit for use as a beverage."

Whereupon the court said:

"Well, you may so consider that, gentlemen of the jury."

An exception was then taken to the last paragraph of the charge quoted above, for the reason that it omitted the element "fit for use for beverage purposes." Whereupon the court said:

"Well, this is called a substandard Jamaica ginger. The evidence shows practically that it was alcohol that had a little ginger coloring in it."

▅ Fitness for use for beverage purposes was a crucial question in the case. The defense was largely predicated on the contention that the ginger extract was medicine and not fit for beverage purposes. Counsel for defendants undertook to establish that the ginger extract was unfit for beverage purposes by cross-examination of the government's witnesses. The issue of fitness for beverage purposes should have been clearly and definitely presented to the jury and not by informal reference to counsels' objection which was addressed, not to the jury, but to the court. It was not even informally presented as to the fourth count and its importance with respect to all the counts was minimized by the statement of the court last above quoted. Furthermore this statement was inaccurate. The evidence did not show that the possession and sales, upon which the fourth count was chiefly predicated, were of substandard fluid extract of ginger, nor that it was "practically * * * alcohol" with "a little ginger coloring in it," as stated by the court. Such showing was made only as to the ginger purchased by Eastland on February 15, 1930.

We are of the opinion that the failure of the court to clearly submit the issue of fitness for beverage purposes, as requested by counsel for the defendants, was prejudicial error.

Reversed and remanded with instructions to grant defendants a new trial.

COTTERAL, Circuit Judge (dissenting).

The extract of ginger alleged to have been sold in this case was shown to be intoxicating liquor, pure and simple. There was no evidence to show it conformed to section 4 (b), title 2, of the National Prohibition Act (27 USCA § 13 (b), or a permit had been obtained under section 4 (a) (27 USCA § 13 (a) to manufacture or purchase it. There was no defense of that character. It was only necessary therefore, to a conviction under the first three counts, that the sale of the liquor was made, that it was intoxicating, and that it was fit for beverage purposes. Under the fourth count, it was only necessary that the defendants maintained a place where such intoxicating liquor, fit for beverage purposes, was being sold. There was no evidence of a case of a sale innocently made, as a medicinal preparation. Also the matter of labels was wholly irrelevant and properly excluded.

The court inadvertently omitted to charge that the ginger must have been fit for beverage purposes, and, on exception being taken, the court said, "Well, you may so consider that, gentlemen of the jury." The jury could not have misunderstood the correction. If counsel was still not satisfied, further exception should have been saved; but it was not done. There was really but slight occasion for a more formal charge, as the court had previously quoted the statute and explained that it was essential that the ginger was sold for beverage purposes, and that the

liquor is fit for beverage purposes, when mixed with water. Besides, the testimony was clear that the ginger was bought for drinking purposes.

The defendants did not testify, and in the case of defendant Keatch an alibi was tendered as a defense. It was properly submitted to the jury. That part of the charge on the subject quoted by the majority opinion was correct. It was in accord with settled principles that such a defense is easily feigned, should be scrutinized as to the time of defendant's absence from the scene of the offense, and, when unfounded, it is a discrediting circumstance against the defendant. Crittenden v. State, 134 Ala. 145, 32 So. 273; State v. Blunt, 59 Iowa, 468, 13 N. W. 427; Walker v. State, 6 Tex. App. 576; People v. Portenga, 134 Mich. 247, 96 N. W. 17; Rayburn v. State, 69 Ark. 177, 63 S. W. 356. I am unable to discover that the instruction was argumentative in any sense.

I think the sentences should be affirmed.